# United States District Court
## EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: the premises located at 1124 Sun Haven Drive, Hugo, Oklahoma, 74743, within the Eastern District of Oklahoma | **FILED UNDER SEAL**<br><br>Case No. 25-MJ-8-DES |

## APPLICATION FOR SEARCH WARRANT

I, Rebecca Davison, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the **EASTERN** District of **OKLAHOMA** *(identify the person or describe property to be searched and give its location)*:

**SEE ATTACHMENT "A"**

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT "B"**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of Title 18, United States Code, Section(s) 842(a)(1), 842(j), and 922(g)(3) and the application is based on these facts:

☒ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Rebecca Davison
Special Agent
Bureau of Alcohol, Tabaco, Firearms, & Explosives

Sworn to :

Date: January 13, 2025

City and state: Muskogee, Oklahoma



_____
*Judge's signature*
D. EDWARD SNOW
UNITED STATES MAGISTRATE JUDGE
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Rebecca Davison, being duly sworn, deposes and states as follows:

## INTRODUCTION AND INVESTIGATOR BACKGROUND

1.     I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) within the meaning of 18 U.S.C. § 3051, and as such, am an officer of the United States who is authorized to investigate violations of the laws of the United States and to execute warrants issued under the authority of the United States. I have been employed by ATF since December 2020. In 2021, I completed the Criminal Investigator Training Program required by the ATF to be an ATF criminal investigator. I also completed the Special Agent Basic Training Academy required by ATF for all special agents employed by ATF. In connection with my official duties as an ATF Special Agent, I investigate criminal violations of federal firearms laws, federal explosives laws and federal narcotics laws. I have further worked alongside other experienced investigators in relation to firearms and narcotics investigations.

2.     As an ATF Special Agent, I know through training that most individuals who purchase firearms retain certain documents relating to those purchases, such as sales receipts, factory warranties, and cancelled checks, among their personal papers in their residence or where they store their personal property. These individuals also maintain financial records, such as but not limited to bank account information, savings account information, and ledgers documenting their financial activities. I also know individuals who are being criminally negligent will hide firearms, ammunition and receipts/invoices related to the acquisition and disposition of firearms in all areas of their property, which includes, but is not limited to residences, outbuildings, appurtenances, and vehicles. Furthermore, individuals who possess illegal weapons will conceal them to keep from being detected by law enforcement.

3. For the reasons set forth below, I respectfully submit that there is probable cause to believe that the property that is the subject of this search warrant includes evidence of the following offenses: Title 18 U.S.C. § 922(o)—Unlawful possession of a machinegun, Title 26 U.S.C. § 5861(d)—Unlawful possession of a firearm not registered to them in the National Firearms Registration and Transaction Record (NFRTR), Title 26 U.S.C. § 5861(e)—Unlawful transfer of a firearm in violation of Title 26 and Title 18 U.S.C. § 922(a)(1)(A)—Unlawfully dealing in firearms without a license.

## PROBABLE CAUSE

4. On May 6, 2024, ATF Muskogee Field Office learned through a Confidential Informant (CI) that a subject identified as C.B. had a Glock with a machinegun switch for sale. J.S., a convicted felon, told the CI that C.B. would sell the CI a Glock with a machinegun conversion device (MGCD) for $1,500. Durant Police Department (DPD) utilized a CI to arrange to give J.S. a ride to C.B.'s residence to purchase the Glock with a MGCD from C.B. The CI met J.S. at J.S.'s residence in Boswell, Oklahoma, within the Eastern District of Oklahoma. They then traveled to Hugo, Oklahoma, and J.S. stated C.B. was also going to trade him a thirty (30) round .22mag pistol for a revolver that J.S. had. Then J.S. discussed with the CI about knowing how the machinegun shot more than one bullet at a time. He further stated that C.B. shot someone when he was 13 years old. J.S. navigated the CI to a residence located in Hugo, Oklahoma, within the Eastern District of Oklahoma. J.S. couldn't get in touch with C.B., and they returned to J.S.' residence. The CI left J.S.' residence and returned to a predetermined location. The CI and his/her vehicle were searched before and after the transaction; and the attempted purchase was monitored and documented with an audio recording device.

5.      On May 15, 2024, DPD utilized a CI to make a controlled purchase of a Glock with a MGCD from C.B. through J.S. The CI contacted J.S. through messages on J.S.' Snapchat account "rscjuice." J.S. contacted the CI through Snapchat messaging and stated C.B. had the machinegun. He previously informed the CI the Glock handgun was $500 and the MGCD was $1,000. The CI met J.S. at J.S.' residence in Boswell. J.S. rode with the CI in the passenger seat and J.S. directed the CI to C.B.'s residence, located in Hugo, Oklahoma, within the Eastern District of Oklahoma. J.S. called C.B. and told him they were on their way. Upon arriving at the location, C.B. opened the front door of the residence and handed the CI one (1) Glock model 19 9mm bearing serial number CAGW767 with a MGCD attached to the rear of the slide in exchange for $1,500. A silver/gray in color Dodge Charger was observed parked in the residence's driveway bearing Choctaw tribal tag which returned to C.B., matching the address of the residence. Upon completion of the transaction, they returned to J.S.' residence in Boswell, OK. The CI left J.S.' residence and returned to a predetermined location where the evidence was handed over to investigators. The CI and his/her vehicle were searched before and after the transaction; and the purchase was monitored and documented with an audio recording device, as the video recording device malfunctioned due to storage capacity. An additional video recording device captured J.S. outside of the residence and the vehicle described above.

6.      The Glock model 19 9mm bearing serial number CAGW767 with a MGCD attached to the rear of the slide was seized by law enforcement officials from the CI after the transaction.

7.      On May 28, 2024, I caused a query in the National Firearms Registration and Transfer Record (NFRTR) for C.B. and discovered he did not have any registered weapons,

including a MGCD. To legally own the MGCD which was attached to the Glock, C.B. would have to have registered the MGCD in the NFRTR.

8.	On May 30, 2024, I sent photographs of the Glock with the MGCD to the ATF Firearms and Technology Branch (FTB) and learned that the device was a MGCD.

9.	On November 21, 2024, during an interview with C.B. and his defense counsel, he admitted to selling J.S. the Glock with a MGCD already installed on it on May 15, 2024. C.B. advised that he purchased the MGCD about one (1) year prior from, Jordan STAFFORD, who he knew resided at 1124 Sun Haven Drive, Hugo, Oklahoma, 74743. C.B. traded STAFFORD a gun for the MGCD, either a Sig Sauer 9mm or Smith & Wesson revolver. He also stated he shot the Glock with the MGCD installed and thought it was cool.

10.	Continuing November 21, 2024, C.B. said that STAFFORD showed a video of him shooting a gun with a MGCD around the same time. STAFFORD told C.B. if he needed more devices, that the guy at House of Guns made them. House of Guns is a Federal Firearms Licensee (FFL) in Boswell, Oklahoma. STAFFORD also told C.B. that guy made "solvent traps" or suppressors. He did not know who the "guy" was at House of Guns making the devices and suppressors. C.B. personally saw STAFFORD in possession of an AR-15 with a silver solvent trap (suppressor) attached to the end of the barrel and he sent C.B. a video of him shooting it. C.B. told STAFFORD he didn't need a solvent trap. STAFFORD also had a solvent trap and a MGCD attached to a Glock style pistol around June or July 2024. C.B. said he and STAFFORD traded approximately ten (10) firearms over time. STAFFORD would post different styles of firearms for sale on Snapchat, and he estimated seeing STAFFORD post approximately ten (10) or more guns within the past year. C.B. and STAFFORD only communicated via Snapchat and Facebook. C.B. stated he also acquired the short-barreled shotgun (SBS) (Remington SPR) seized by ATF on July

4

17, 2024, from STAFFORD. C.B. traded STAFFORD a green .22 caliber rifle with a scope for a Sig Sauer 9mm and the Remington SBS. C.B. later traded the Sig Sauer 9mm back to STAFFORD for the MGCD. A query of the NFRTR for the Remington SPR bearing serial number 04094467R showed the firearm was not registered to C.B.

11. To legally own an SBS, the owner must register it with the NFRTR.

12. On November 30, 2024, I caused a query of the NFRTR and learned that STAFFORD did not have the above-mentioned Remington SPR short-barreled shotgun, any MGCD, or any NFA weapons registered to him.

13. A records check indicated STAFFORD is not an FFL. In my training and experience, the manner in which STAFFORD is advertising firearms for sale, the manner in which he sold the illegal MGCD (which itself qualifies as a firearm), the amount of firearms that went in and out of STAFFORD'S possession indicate a potential for their resale for profit, the manner in which C.B. was referred to another individual for the potential purchase of illegal MCGD's and suppressors indicate that STAFFORD is involved in the unlicensed dealing in firearms. Individuals engaged in the dealing of firearms without a license often dispose of them quickly in order to obtain additional firearms.

14. In my training and experience, individuals owning and selling firearms typically keep other firearms and ammunition on their property or located near their residence for long periods of time. Further, individuals who sell SBSs and MGCDs may have more such firearms that violate the requirements of the NFA to register such devices with the NFRTR.

15. I know that STAFFORD resides at 1124 Sun Haven Drive, Hugo, Oklahoma, 74743, within the Eastern District of Oklahoma. As previously mentioned, C.B. admitted to acquiring a MGCD from STAFFORD at the location. Additionally, law enforcement has observed

him frequenting the residence. I also observed a vehicle registered to STAFFORD parked at the residence on January 1, 2025.

## TECHNICAL TERMS

16. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a) *Wireless telephone*: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include storingnames and phone numbers in electronic "address books;" sending, receiving, andstoring text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessingand downloading information from the Internet. Wireless telephones may also include global positioning system ("OPS") technology for determining the location of the device.

    b) *Digital Camera*: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic films. Digital cameras use a variety of fixed and removable storage media to store their recorded images.

Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c) *Portable media player*: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d) *GPS*: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current

time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e) *PDA*: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f) *Tablet*: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or

otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending, andreceiving e-mail, and participating in Internet social networks.

g) *Pager*: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h) *IP Address*: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP addressso that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static- that is, long-term-IP addresses, while other computers have dynamic – that is, frequently changed-IP addresses.

i) *Internet*: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

17.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period on the device. This information can sometimes be recovered with forensics tools.

18.     I know that cellular telephones often equipped with digital cameras and those phones possess the capability to transmit and/or store electronic images. I know that in many cases, cellular telephones maintain photographs of illegal activities, including burglary, knowing possession of a stolen firearm, and other violations of Title 18 of the United States Code. These photos are sometimes stored in their cellular phones and often are transmitted or sent from one electronic media device to another. I also know that cellular phones may also contain notes regarding potential illegal acts that are recorded by the subject who possesses the electronics. Furthermore, I know that text messages and emails are often used by two or more persons to communicate information regarding illegal activities, between principals and co-conspirators of those crimes.

19.     I know that cellular telephones are utilized by the majority of individuals in the United States and have become a staple of communication between individuals using text messaging, visual and audible communications (telephone calls and FaceTime type communications) as well as applications like "Snapchat." Additionally, individuals utilize their cellular devices to take pictures, keep notes, as a GPS (global positioning System) device, and even to conduct illicit or illegal activity. Communications on phones are kept for long periods and transferred from one phone to another when replaced. This is done through the use of Cloud storage and direct transfer conducted at the time of purchase or by the individual themselves. Individuals utilize this method so as not to lose data that is stored on the phone such as contacts,

photos, notes, and other important information to the individual. This data includes contacts used to conduct illegal activities to include the illegal sale or possession of firearms, and other violations of Title 18 of the United States Code.

20. Cellular telephones are often used to facilitate offenses and allow criminals to maintain communication with each other before, during, and after the commission of offenses. I am aware that cellular telephones have the capacity to store a vast amount of information, including but not limited to telephone numbers, voice messages, text messages, e-mail, photographs, videos, address books, records, phone call histories, contact and other information. This information may be contained on the cellular telephone.

21. Electronic devices such as cellular phones, computers, lap-tops, I-Pads, tablets, or other electronic media can be used to communicate through other individuals through applications or platforms such as Facebook and Snapchat. According to C.B., STAFFORD has used the platforms of Facebook and Snapchat to advertise firearms for sale. MGCDs and suppressors are classified as firearms according to United States Code Title 26, Section 5861. As such STAFFORD's electronic devises may contain evidence to the acquisition and/or sale of these items.

## CRIMINAL HISTORY

22. Jordan STAFFORD has one prior arrest for misdemeanor possession of controlled substance, speeding, and carrying weapons in Edmond, Oklahoma. STAFFORD pleaded nolo contendere.

## CONCLUSION

23. Based on my investigation, Jordan STAFFORD possessed an unregistered shotgun and machinegun in the Eastern District of Oklahoma. STAFFORD is known to live at 1124 Sun

Haven Drive in Hugo, Oklahoma and has been observed by law enforcement at the residence. Since this affidavit is being submitted for the limited purpose of enabling a judicial determination of whether probable cause exists to justify the issuance of a search warrant for the described premises, I have not included every fact known concerning this investigation to me and others involved in this matter. I have set forth only the facts that I believe are essential to establish the necessary foundation for a search warrant ordering the search of the described premises.

24.   Based upon my training and experience, and the facts set forth herein, I believe there is probable cause to believe Jordan STAFFORD has violated Title 18 U.S.C. § 922(o), Unlawful possession of a machinegun; Title 26, U.S.C. § 5861(d), Unlawful possession of a firearm which is not registered to them in the National Firearms Registration and Transfer Record (NFRTR); Title 26, U.S.C. § 5861(e), Unlawful transfer of a firearm; and Title 18 U.S.C. § 922(a)(1)(A)—Unlawfully dealing in firearms without a license. Furthermore, I believe that there is probable cause to search 1124 Sun Haven Drive, Hugo, Oklahoma, 74743, the residence of STAFFORD, to include all storage places, safes, garages, structures, and any automobiles which may be found within the curtilage of said suspected premises as more fully described in Attachment "A."

25.   I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises described in Attachment "A" for the things described in Attachment "B."

_____
Rebecca Davison
ATF Special Agent

Sworn to me on January 13, 2025.

_____
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF OKLAHOMA

# ATTACHMENT A

The place to be searched is the premises located at **1124 Sun Haven Drive, Hugo, Oklahoma, 74743**, Eastern District of Oklahoma, to include all storage places, safes, garages, structures and any automobiles which may be found within the curtilage of said suspected premises. The place to be searched is described as a red brick, single family residence. The garage is tan in color. The residence faces south.

GPS coordinates: 33.9994407, -95.5291479





## ATTACHMENT B

1. Any and all firearms. Any items pertaining to the possession, ownership and/or disposition of any firearm, to include but not limited to gun cases, ammunition, shell casings, ammunition magazines, holsters, spare parts for firearms, photographs and video tapes of firearms or person(s) in possession of firearms, acquisition or ownership documents, and receipts for the purchase and for repair of all of these items.

2. Any and all machine gun conversion devices and suppressors (solvent traps).

3. Records to establish the persons who control, possess, and have custody or dominion over the property searched and from which evidence is seized, to include but not limited to: personal mail, checkbooks, personal identification, notes, other correspondence, utility bills, rent receipts, financial documents, keys, photographs, leases, mortgage bills and telephone answering machine introductions and messages, and all records related to telephone records.

4. Personal books, and papers reflecting, names, addresses, telephones numbers, and other contact or identification data relating to the acquisition and possession of firearms.

5. All Electronic devices capable of accessing messaging platforms such as Facebook and Snapchat, including but not limited to cellular phones, computers, lap-tops, I-Pads, tablets, or other electronic media.